Weiss Imbesi PLLC
Marni E. Weiss, Esq.
450 Seventh Avenue Suite 3002
New York, New York 10123
mweiss@weissimbesi.com

FILED
CLERK

2010 OCT 27  PM 4: 39

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

JOSEPH C. JAMES,

                                     Plaintiff,

                  -against-

COUNTRYWIDE FINANCIAL CORP.,
COUNTRYWIDE HOME LOANS, INC.
BANK OF AMERICA, CORP.
ROBERT DONOVAN,
WILLIAM PURSCHKE AND
SCOTT HOROWITZ,

                         Defendants.

-------------------------------------------------------------------x

Civil Action No.

**CV10- 4953**

**COMPLAINT**

**JURY DEMANDED**

HURLEY, J.

WALL, M.J

## PRELIMINARY STATEMENT

The Plaintiff, Joseph C. James, brings this action by his attorneys, Weiss Imbesi PLLC, against

defendants Countrywide Financial Corp., Countrywide Home Loans, Inc. and their parent

company, Bank of America, Corp. (all of such entities shall be hereinafter collectively referred

to as the "Corporate Defendants") seeking damages and other appropriate relief for his claims

including employment discrimination and retaliation on account of his race, African American,

in violation of his statutory, civil and human rights under Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. §2000e *et. seq.* (hereinafter "Title VII") and the Civil Rights Act of

1

1991; 42 U.S.C. §1981 ("hereinafter referred to as "§1981); 42 U.S.C. §1983 (hereinafter referred to as "§1983"); and under Article 15 of the Executive Laws of the State of New York, §290 et. seq., including §296 as amended, (hereinafter referred to as the "State Human Rights Law" or the "State HRL"). Plaintiff also brings this action against his individual former supervisors of the named Corporate Defendants seeking damages and such other appropriate relief as this Court shall deem just and proper, namely Robert Donovan, William Purschke and Scott Horowitz, individually and jointly, for their discriminatory and retaliatory acts, behavior and conduct against Plaintiff in violation of his rights under the State HRL, as individual and joint aiders and abettors of the discrimination, retaliation and hostile work environment suffered by plaintiff as hereinafter described in this Complaint.

This is an action seeking damages and other appropriate relief against each of the named Corporate and Individual Defendants for their discriminatory and retaliatory acts, conduct, practices, policies, behaviors, harassment, hostile work environment and all related adverse employment actions suffered by Plaintiff Joseph James, all of which violated the statutory, civil and human rights protections afforded Plaintiff under applicable federal and state laws. Therefore, Plaintiff Joseph C. James hereby states and alleges as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of the actions complained of pursuant to 28 U.S.C. §1331, by virtue of a federal question under Title VII (42 U.S.C. §2000e-3(a). Venue lies with this Court pursuant to 28 U.S.C. §139(b) and 42 U.S.C. §2000e-5 because the incidents alleged in this Complaint occurred within the Eastern District of the State of New York, namely in the county of Nassau in Long Island, New York. This Court has pendant

2

jurisdiction for Plaintiff's state claims. Jurisdiction over the supplemental state law claims and common law claims arises under 28 U.S.C. §1367.

2.    Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under Title VII and has standing to bring this action. Plaintiff timely filed with the U.S. Equal Employment Opportunity Commission ("EEOC") via his Verified Complaint, dated December 18, 2009, with the New York State Division of Human Rights ("SDHR") and he has fully exhausted his administrative remedies before commencing the within action.

3.    On July 29, 2010, EEOC issued Plaintiff a Notice of Suit Rights (the "EEOC Notice"), a copy of which is annexed hereto as Exhibit "1". Between 2008 and 2009, Countrywide Home Loans, Inc. and Countrywide Financial Corp. were acquired by Defendant Bank of America, Corp. and, upon information and belief, each of said defendants continue to be wholly-owned subsidiaries of said Bank of America, Corp.. Bank of America, Corp. was copied on Plaintiff's EEOC Notice as reflected therein.

4.    Declaratory relief, damages, and all other appropriate legal and equitable relief are sought pursuant to 42 U.S.C. §2000e-5(f), (g) (1), and (g) (2) (B) (i). Compensatory damages are sought pursuant to Title VII, 42 U.S.C. §1981A(a) and New York State Executive Law Article 15, §297(9). Punitive damages are further sought pursuant to Title VII as amended by the Civil Rights Act of 1991 and 42 U.S.C. §1981a(b)(1).

5.    Costs and attorneys' fees are sought pursuant to 42 U.S.C. §2000e-5(g)(2)(B)(i) and (k).

6.    Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §1391(b) because the discriminatory and retaliatory acts and conduct complained of herein occurred within this judicial district and Bank of America Corp., one of the Corporate

3

Defendants and Bank of America, Corp. parent company of the Countrywide Defendants, upon information and belief, has a place or places of business in the county of Nassau and elsewhere in New York State, including its New York City regional headquarters.

## PARTIES

7. Plaintiff Joseph C. James (hereinafter "Plaintiff" or "James") is and was at all relevant times herein an individual New York resident, now residing in the village of Amityville, County of Suffolk, State of New York, who was an employee of the Corporate Defendants (as hereinafter defined below) in the various capacities he held during his employment commencing in and about February, 2003.

8. Defendants, Countrywide Financial Corp. and Countrywide Home Loans, Inc. ("Countrywide Financial" and "Countrywide HL", individually or the "Countrywide Defendants", collectively) are and were, at all times relevant herein, upon information and belief, duly organized and existing as domestic corporations pursuant to and under the laws of the State of Delaware in the case of Countrywide Financial and the State of New York in the case of Countrywide HL. At all times relevant herein, the Countrywide Defendants individually and/or jointly engaged in the business of mortgage and home loan services and lending and other financial services nationally and locally in the state of New York. Upon information and belief, Countrywide HL continues to have offices located at 4500 Park Granada Boulevard, in the city of Calabasas, State of California. Since the merger of the Countrywide Defendants with defendant Bank of America, Corp., the Countrywide mortgage and home loan banking operations also are located at its parent company's Northeast regional headquarters in New York City, State of New York as well as at its parent's executive headquarters in the city of Charlotte, State of North Carolina.

4

9.     Defendant, Bank of America Corp. ("BOA" or "Defendant", or sometimes hereinafter collectively with the Countrywide Defendants, are referred to as the "Corporate Defendants") is and was at all times relevant herein duly organized and existing as a domestic corporation pursuant to and under the laws of the State of Delaware.  BOA is a leading national financial, banking and lending institution with its New York regional headquarters, upon information and belief, located at Bank of America Tower at One Bryant Park, city of New York, State of New York, and its corporate headquarters located at 100 North Tryon Street, in the city of Charlotte, State of North Carolina.  BOA maintains an extensive national network of branch offices for the purpose, among others, to provide banking services that include mortgage and other home loan products and services to its customers in the State of New York.  Upon information and belief, BOA acquired the Countrywide Defendants by merger in or about 2008-2009 to continue the home mortgage loan and related businesses of these Countrywide entities.  Upon information and belief, BOA was and continues to be the current employer of one or more of the "Individual Defendants" as collectively defined below and described herein.  Further, upon information and belief, BOA organized and filed with the New York Secretary of State a domestic limited liability corporation, Bank of America Capital Advisors LLC, in April 2010 and Plaintiff hereby reserves the right to add this entity as a party defendant if after discovery he learns that its predecessors-in-interest and/or parent company, BOA, acting through this newly formed limited liability company, participated or otherwise has liability relating in any way to the subject matter of this Complaint, including without limitation, by reason of its past or current relationship to the Corporate Defendants.

10.     Defendant Robert Donovan (hereinafter individually referred to as "Donovan" and collectively with William Purschke and Scott Horowitz, as the "Individual Defendants"),

5

who, upon information and belief, is an individual residing in the State of New York was and continues to be an employee of the Corporate Defendants. He is a former supervisor of Plaintiff.

11. Defendant William Purschke (hereinafter individually referred to as "Purschke" or collectively with Donovan and Scott Horowitz, as the "Individual Defendants") is an individual who, upon information and belief, resides in the State of New York and was formerly employed by the Corporate Defendants. He is a former supervisor of Plaintiff.

12. Defendant Scott Horowitz (hereinafter individually referred to as "Horowitz" and collectively with Donovan and Purschke, as the "Individual Defendants") is an individual who, upon information and belief, is a resident of the State of New York and was and continues to be an employee of the Corporate Defendants. He is a former co-Branch Manager with Plaintiff and eventually became Plaintiff's supervisor after James' demotion as further described in this Complaint.

13. As alleged herein, all of the acts and failures to act were duly performed by and attributable to the Corporate Defendants, their officers, management, supervisory staff and each person, representative and agent delegated to perform the functions associated with making employment decisions regarding the terms, conditions and privileges of Plaintiff's employment, acting as an alter ego of said Defendants and vicariously, as an integrated enterprise, agent, employee, or under the common direction and control of the others working for the Corporate Defendants or at the behest of the Corporate Defendants or carrying out the duties and responsibilities of such Defendants, except as otherwise specifically alleged. The alleged acts and failures to act were within the scope of such agency and/or employment, and the Corporate Defendants and such representative, management, supervisory and operating personnel,

participated in, approved and/or ratified the other Defendants' unlawful acts and omissions alleged in this Complaint.

## FACTUAL ALLEGATIONS

14.     Plaintiff is now a 56 year old African American male who, at all times relevant herein, possessed the requisite qualifications, training, skills and core competencies, proven track record and year of work experience for the various titles and positions he held and/or for which he was initially hired, then promoted and later demoted as more particularly set forth in this Complaint.

15.     On or about February 24, 2003, Plaintiff was initially hired to join the Countrywide Defendants' Wholesale (broker) Division in the position of Area Sales Manager by the then Regional Vice President, Jeffrey Creighton ("Creighton") to work in the Jericho, NY office.

16.     Plaintiff's duties and delegated responsibilities included the securing of mortgage loan applications from retail mortgage brokers for funding by the Countrywide Defendants' wholesale division.

17.     Before Plaintiff joined Countrywide in 2003, he was successfully employed by Staten Island Savings Bank's SIB Mortgage division as a Branch Manager and wholesale account manager for 7 ½ years.  He accepted the position as a Wholesale Area Manager (with responsibilities in the nature of account representative) with the understanding, at the time of hiring, that he would be considered for promotion to a higher management position in the future when available.

7

18.     Countrywide had a number of different compensation packages depending on whether an employee was assigned to the Wholesale Division or the Retail Division. Plaintiff's compensation was initially based on a company-wide Wholesale Division pay structure that consisted of a combination of an annual base salary, monthly draws against future commissions, bonuses, plus payment of mobile phone service and car allowance.   Plaintiff learned that the area sales managers on the retail side had significantly greater earning potential and career growth.  As a result, Plaintiff set his career goals to eventually be assigned to Countrywide's Retail Division.

19.     Between 2003 and 2006, Plaintiff excelled as a Wholesale Division Area Manager and earned top company awards for multiple years.  He was continually praised by the then supervisor (Creighton) concerning his stellar performance noting that James was regarded by the company as "a top producer".  In fact, Plaintiff was then informed by Creighton that he ranked nationally in the top 1% of all sales personnel and officially designated as a "Platinum Producer" for the 2004 and 2005 production years with company recognition of his high achievements and successful track record at Countrywide in their Wholesale Division.

20.     Thereafter, Plaintiff's hard efforts translated into a new lucrative opportunity including promotion with managerial title in or about May 1, 2006 when he was promoted by Creighton to Area Sales Manager and assigned to the Wholesale (broker) Division Branch located at 2 Jericho Plaza, Jericho, NY.  His responsibilities now consisted of managing a team of 12 lower level Area Managers.

21.     However, less than one year after his new lucrative promotion, on or about March 10, 2007, Plaintiff learned, while on a company-wide conference call, that his position was being

8

eliminated due to a mass reduction-in-force and his employment was being terminated effective immediately.

22.     Approximately one week after the reduction-in-force announcement was made, Plaintiff James was then contacted by a Countrywide Human Resources representative regarding the company's decision to seek his retention by offering him a different managerial job opportunity based upon his impressive track record and successful job performance as an Area Sales Manager. James was quickly referred to the Countrywide Defendants' Full Spectrum Division.

23.     Shortly thereafter, a Countrywide Full Spectrum Human Resources representative scheduled James for an interview for the position of Branch Manager in the *Retail Division* at Full Spectrum's retail branch located in Lake Success, New York. This branch was under the management of Regional Vice President Job Turini ("Turini").

24.     While Plaintiff ultimately never personally met with Turini as hereinafter set forth, James learned afterwards that Turini was a Caucasian male of Greek descent.

25.     Full Spectrum Division Human Resources directed James to be in contact with Turini to confirm arrangements for the interview to be held on March 20, 2007 for a Full Spectrum Branch Manager position working under Turini. Plaintiff was thrilled to be presented with this job opportunity and expended considerable effort preparing for his imminent interview with Turini.

26.     Plaintiff regarded the Countrywide Defendants' decision to retain him (after the reduction-in-force) as an extremely beneficial career development because he could look forward to future lucrative employment and, if his interview went well, it would enable him to finally move to the *Sub Prime Retail Division.* However, James was not prepared for what transpired in

that his job interview *never materialized* at Full Spectrum's Lake Success Retail Branch office much to his disappointment and professional humiliation.

27.     Just prior to the interview date, Turini spoke with Plaintiff on the phone expressing much enthusiasm to meet with James for the Branch Manager position remarking that he (Turini) had been made aware of Plaintiff's successful track record and performance history with the Wholesale Division. The parties then confirmed the date and time of the interview at the Lake Success Branch office.

28.     Plaintiff arrived to the Lake Success Branch office early on March 20, 2007 for his job interview.  He was told that Turini was not in the office.  Neither Turini nor his office administrator contacted James to inform him that Turini was or would be unavailable.  After more time passed without any word from Turini, Plaintiff found it very strange that this Full Spectrum Regional Vice President was nowhere to be found.

29.     Turini was a blatant "no-show" for pre-scheduled Plaintiff's interview.  Neither Turini (nor his Branch office) ever formally canceled or moved the interview date while Plaintiff patiently waited for Turini's arrival. Plaintiff had no further dialogue with Turini. No attempt whatsoever was made by Turin to communicate with Plaintiff again or personally apologize to him for the bizarre and disappointing mishap.

30.     This was Plaintiff's first warning that there was a stark and substantial difference in the treatment of minority employees within the Countrywide Defendants' *retail* divisions.

31.     Plaintiff informed Full Spectrum's Human Resources that the interview was not held for reasons that were not made known to him.  The Human Resource representative made another futile attempt to reschedule the interview *to no avail*.

10

32.     Plaintiff found himself in an awkward set of circumstances and felt professionally denigrated, dejected, embarrassed and humiliated by the bizarre conduct of the Countrywide Defendants' Full Spectrum Division and Turini. Turini not only failed and/or refused to reschedule Plaintiff's job interview, but also completely ignored Plaintiff's follow-up calls.

33.     James was later warned by a (former) employee who had worked directly with Turini in the Full Spectrum Division that Turini was known to strongly favor the hiring of Caucasians of Greek decent. James was stunned by this news and crushed by the possibility that he was not considered for this job by Turini on account of his race and not even interviewed or responded to again because he was *African American*.

34.     Prior to the reduction-in-force in March 2007, Plaintiff knew that his picture was posted on the company's employee intranet website which was, at all times relevant herein, accessible to all employees *including Turini*.

35.     Plaintiff then requested that Full Spectrum Human Resources refer him to different regional division for job consideration *even if it meant that James would have to relocate outside of the New York area*.

36.     James reasonably believed that his employment opportunities were nonexistent in the New York Region *since Turini was in charge of that region* and already "sent the message" to James that he would not be hired by Turini (after blatantly avoiding any interview or hiring of James).

37.     The Countrywide Defendants and their Human Resource personnel knew or should have known that Turini had a history of preferential hiring of persons for the Full Spectrum Division who were Caucasian and of Greek descent to the exclusion of *African American* employees such as James.

11

38.     James was more than qualified for the Branch Manager position to work under Turini. Countrywide's own Human Resources staff specifically recruited James on such basis after the mass layoff.

39.     At Plaintiff's continuing behest, Countrywide's Wholesale Division Human Resources office then referred James to the Consumer Markets Retail Division (CMD).

40.     On or about March 29, 2007, Area Sales Manager, Dennis Racio, interviewed Plaintiff for a position in the Massapequa Park, Long Island, NY office.  Plaintiff was offered the position of a Retail Sales Manager with the understanding, at the time of his hiring, that he would be eligible for a promotion to Branch Manager in the near future.

41.     On or about April 11, 2007, Plaintiff began this new managerial post and not surprisingly experienced immediate success again in the performance of his job and continuing impressive track record as a *manager*.  James' was hired to get a new branch up and running and to recruit personnel for it.  He was also assigned the management of Home Loan Consultant, Karen Laurence ("Laurence").

42.     On or about July 11, 2007, Plaintiff was promoted to Branch Manager at the Massapequa Park office and was offered what he was led to believe was commensurate with other Branch Manager compensation packages, valued at approximately $190,000.00 per year (prorated from July 11, 2007) in the form of annual base salary, quarterly bonuses to be paid out on a monthly basis, and monthly draws against future commissions (to be paid monthly during recruiting of new hires) together with reimbursements of his mobile phone usage and car mileage, plus additional fringe benefits including healthcare coverage, and valuable employee benefit plans such as the company's 401K Plan.

43.     Before Plaintiff accepted this job promotion as Branch Manager, he was informed that his assigned new branch office was then operating without any prior management oversight and had only one home loan consultant (Karen Laurence) working there. Among Plaintiff's highest priorities was to recruit and hire salespersons and administrative support staff. James was informed that he would not be subject to specific branch production outcomes as yet because the first priority was to recruit and hire.

44.     Less than one month after James' promotion to Branch Manager, Defendant Donovan, a Regional Senior Vice President (and Plaintiff's new immediate supervisor), showed up at his branch (on or about August 6, 2007) with Defendant Horowitz, a Caucasian male loan producer who had been employed by a Countrywide competitor.

45.     Plaintiff was informed by Donovan, in an intimidating and condescending manner, that Horowitz had been recruited and hired *by Donovan* for Plaintiff's branch, but that Horowitz was *not* hired to be one of Plaintiff's subordinate sales managers. Instead, he was hired as a "Co-Branch Manager" so that there would now be *two* Branch Managers for the same location.

46.     In less than 30 days of being promoted as *the* Branch Manager, he was upstaged and disregarded by Defendant Donovan and denied any decision-making authority whatsoever in Horowitz's hiring even though he had full delegated authority for recruiting new hires for his branch. Donovan's decision to give Horowitz the title of co-Branch Manager without any warning to Plaintiff was assaulting, shocking, professionally denigrating and embarrassing for him.

47.     Donovan's actions to intentionally bypass and ignore Plaintiff's hiring and managerial authority and to thereafter undermine, interfere with and marginalize Plaintiff's

13



promised leadership of his assigned Branch office was directed at Plaintiff without any legitimate grounds and was carried out in a discriminatory manner to disrespect James and did deprive him of the full terms, conditions and privileges of his promotion and designation *as one of only two African American Branch Managers* in Donovan's assigned region.

48.     The outrageous and unprofessional treatment of James by the Corporate Defendants and Donovan continued after the unilateral hiring of his Caucasian counterpart (Defendant Horowitz) and eventually resulted in their multiple adverse actions that threatened James' future employment and created a hostile and oppressive work environment.

49.     Defendants Donovan, Purschke and Horowitz sabotaged and interfered with James' production, his chances for further career advancement and adversely compromised and limited Plaintiff's future earnings potential when Donovan hired Plaintiff's Co-Branch Manager and said defendants failed to retain the continuing employment of Home Loan Consultant, Laurence (a top producer).

50.     All of the Defendants' acts, failures or refusals to act, and their individual and joint malicious and unprofessional conduct were designed to belittle, humiliate, harass and demean Plaintiff and to cause him to be unable to succeed as a Branch Manager and created intolerable working conditions for Plaintiff that adversely affected his ability to manage the Branch and rendered it impossible for James to earn a living.

51.     When Plaintiff accepted the position to be *the* Branch Manager, he was placed in sole charge of operating the new Massapequa Park Branch office including, without limitation, all recruiting, hiring, training and managing of new hires and the existing Home Loan Consultant, Laurence.

14

52.     Instead, by Donovan's (and later Purschke's) actions, behavior and conduct to render Plaintiff powerless as a Branch Manager, James was deprived of his delegated authority as an *African American* Branch Manager to exercise managerial discretion in handling the daily branch operations and production, and in terms of the hiring and recruitment process which constituted a breach of material terms, conditions and privileges of his job promotion and adversely affected his promised compensation package based on his Branch office's production.

53.     However, the Corporate Defendants, by their agent(s), Defendant Donovan (and later with the aid of Defendants Purschke and Horowitz), engaged in discriminatory conduct that stripped Plaintiff of his dignity by circumscribing his delegated authority and discretion and ignoring his professional standing as a well-regarded and respected Countrywide manager *who was one of only two (2) African American Branch Managers in Donovan's regional area.*

54.     Because James was an *African American* mortgage loan professional, he was not afforded management's respect and its promised leadership opportunities accorded to other branch managers.  Plaintiff was made to feel like the "token" *African American* Branch Manager at the Massapequa Park branch office which was located in a community having a predominately Caucasian population.

55.     A continuing and consistent pattern of discriminatory conduct was being imposed on James and although he complained to Human Resources (as described in this Complaint), nothing was done to help him.  By hiring Horowitz, Donovan made sure that Plaintiff James was not the only Branch Manager "face" that Caucasian customers would see. By the Corporate Defendants allowing Turini to avoid interviewing or hiring Plaintiff for the Full Spectrum Lake Success office (another predominately Caucasian community), management also was able to keep the status quo of employee demographics in that branch office.

15

56.   Plaintiff also was subjected to harsh and relentless ridicule and double standards by the Individual Defendants which James verbally reported and then formally submitted complaints to the Corporate Defendants *to no avail.*

57.   Plaintiff suffered blatant acts of discrimination motivated by racial bias that directly and indirectly resulted in diminishing his authority and detrimentally altering his future professional standing with the Corporate Defendants.  He suffered the adverse impact of the foregoing on the terms, conditions and privileges of his *promoted* job title, managerial position and compensation.  His discriminatory treatment and the adverse employment actions he suffered were taken against James notwithstanding that he is and was an accomplished, successful and proven *African American* mortgage loan professional and duly qualified to act and perform as a *sole* Branch Manager.

58.   The Defendants' failure and/or refusal to fully recognize James' job qualifications and compensate James on par with his non-African American Branch Managers based on his credentials, stellar proven track record for production, positive performance evaluations, hands-on managerial experience while employed by Countrywide (all of which exceeded that of Horowitz, a *Caucasian new hire* who was immediately given preferential treatment including the title of Branch Manager with, upon information and belief, a more favorable compensation package than James who had been working for Countrywide for *many years).*

59.   Such adverse employment decisions of Plaintiff's management were wrongfully and unlawfully motivated by racial bias and retaliatory animus.  Plaintiff's promotion to Branch Manager was (drastically) altered without any legitimate basis for undercutting Plaintiff or for reaching a decision that Plaintiff needed a co-Branch Manager to help him oversee his assigned

16



Branch.  Such acts, conduct and racial bias constituted violations of Plaintiff's statutory, civil and human rights and also breached his employers' implied covenant of good faith to not discriminate, harass or retaliate against any African American managers on account of their protected classification(s)s as sct forth in various employer written policies.

60.    The numerous egregious failures of the Corporate Defendants to stop the discrimination and retaliation suffered by Plaintiff even *after* he submitted internal complaints and grievances left Plaintiff feeling shocked, harassed and professionally denigrated.

61.    The decision to add Defendant Horowitz as a co-Branch Manager resulted in substantially diminishing Plaintiff's ability to supervise the branch and adversely affected his payout under his promised compensation package.  Further, it resulted in James, alone, being relegated the lion share of *ministerial* duties pertaining to Horowitz's hiring, including requisitioning business cards and stationery and obtaining desk top items for Horowitz, as if Plaintiff was Horowitz's subordinate and not his equal.

62.    The hiring of Horowitz also resulted in James receiving a less favorable compensation package. For example, Defendant has reason to believe that Horowitz's compensation package contained a provision for a *more substantial* guaranteed bonus payable at the end of March 2008 and a greater flat minimum number of basis points on all mortgage and home loan production that was compared to Plaintiff.  Yet, Plaintiff qualified for promotion to the *same* Branch Manager position (as Horowitz) just a few weeks earlier because he was with Countrywide as a stellar performer for five years and achieved a proven track record of outstanding success according to the feedback from past supervisors who gave Plaintiff very positive annual performance evaluations.

17

63.     Plaintiff also was misinformed by Defendant Purschke (who joined Countrywide shortly after Horowitz on or about September 15, 2007) that both James and Horowitz had *the same* minimum flat basis points commission structure on all mortgage loan production at their Branch. These basis points constituted a material component of Plaintiff's compensation package. Plaintiff then became aware that Purschke previously managed Horowitz at a competitor company's branch.

64.     Although Plaintiff remained traumatized by Donovan's sudden decision to alter James' promotion and managerial capacity to Co-Branch Manager, James cooperated and trained Horowitz for several weeks on branch systems and procedures.  Plaintiff was instrumental in aiding Horowitz's smooth transition to operating and managing the Branch office consistent with Countrywide's business model.

65.     In addition to the amount of compensation paid to Plaintiff, he observed that Horowitz received more favorable treatment by Defendants Donovan and Purschke as compared to Plaintiff including without limitation:

(a) Purschke would visit Horowitz at the branch without visiting Plaintiff and shunned Plaintiff;

(b) Purschke would promptly return Horowitz's calls yet ignore Plaintiff's calls or fail and/or refuse to return calls to James in a reasonable period of time;

(c) Purschke also would attend Horowitz's sales presentations at real estate brokers' offices, but ignore Plaintiff's events, including one sponsored by *100 Black Men of Long Island*;

(d) Purschke and Donovan provided Horowitz with strong management support and company resources and failed and/or refused to provide the same to Plaintiff;

18

(e) When Plaintiff sought Purschke's and/or Donovan's management support, James would be subjected to harsh ridicule, intimidation and condescending demeanor;

(f) Purschke and Donovan ignored Plaintiff's communicated concerns about the insubordinate conduct of an employee, Karen Laurence. They did not provide any requested senior managerial support to aid James in seeking an internal resolution;

(g) Purschke and Donovan intentionally withheld their knowledge of Laurence's request for a transfer, refused to address her non-compliance with Countrywide policies and sabotaged Plaintiff's ability to have any positive resolution to retain Laurence and her valuable production;

(h) Purschke's and Donovan's (and Human Resource's) intentional withholding of material information concerning a top producer transfer request was not only contrary to formal company policy, but also threatened the sustainability of the Branch and manipulated the outcome of Plaintiff's job performance and continued employment;

(i) When Plaintiff sent an internal complaint to Human Resource Manager, Karen Zimmerman ("Zimmerman") on November 28, 2007 concerning the discriminatory conduct and racial bias to which he was subjected, Purschke informed James *on the same day* that his assigned branch was being closed with elimination of his Branch Manager position and that his employment was being terminated effective two days later on November 30, 2007;

(j) When Purschke admitted to Plaintiff that his *Caucasian counterpart* (Horowitz) who had only been employed with the Countrywide Defendants about 3 months) was being retained as a Branch Manager and transferred to another office in the same managerial capacity, he only offered Plaintiff (in response to James' inquiry) the option of being

19

demoted to a sales manager *for less compensation and reporting to Horowitz as his new supervisor*; commenting "I didn't know you would want to stay on in a lower position.";

(k) When Plaintiff was demoted to a Sales Manager position (in lieu of his involuntary termination in November 2007), it came with a substantial reduction in his compensation. Purschke offered Plaintiff a compensation package that was materially inferior to what he had earned and what Horowitz continued to earn by being retained as a Branch Manager. Plaintiff received a commission package that included only monthly draws that were below the amounts of his Creighton (Caucasian) and when Plaintiff asked Purschke to increase the draws to match Creighton's, James' request was refused; and

(l) Plaintiff was subjected to unusually slow processing of customer loan applications as compared to others which adversely affected the timing and amount of his payout under his compensation and/or commission structure as compared to Horowitz.

66.     The foregoing actions and inactions of Plaintiff's Caucasian supervisors and Human Resources personnel including their decision(s) to keep Plaintiff in the dark prevented James from protecting against the loss of valuable production (Laurence) or taking proper measures to prevent Laurence from diverting Countrywide customers. The failure of Purschke and Donovan to render any senior management support for Plaintiff's expressed concern to handle anticipated branch exposure issues with Laurence, their lack of response effectively destroyed Plaintiff's opportunity to retain his assigned Branch's production.

67.     Purschke refused to address or discipline a *Caucasian* employee for being insubordinate to her *African American* manager. Instead, Purschke excused Laurence's insubordinate behavior by not addressing it in a meeting with Plaintiff even after the discovery that she was also employed, upon information and belief, simultaneously with a competitor.

20

68.     Plaintiff was shocked and traumatized by this unfolding of events and that his demotion would result in Horowitz being his new supervisor. He was devastated that the Corporate Defendants would ignore his previous stellar performance, loyal years of service and successful track record just months shy of Plaintiff becoming fully vested with Countrywide. It was professionally demeaning for Plaintiff to report to his former Co-Branch Manager.

69.     When Plaintiff complained that Creighton, his former (Caucasian) subordinate (who had less years of experience than James), was being paid a much larger draw and asked Purschke to match said draw, Purschke refused which further embarrassed and humiliated Plaintiff.  It was professionally demeaning for Plaintiff's Caucasian subordinate to have a higher compensation package than his *African American* manager.

70.     When Plaintiff asked Purschke to increase Plaintiff's commission basis points to .75 basis points, in order to compensate Plaintiff for the substantially lower income, he was later informed by email that .65 basis points was the *maximum* flat basis points allowable. Yet, upon information and belief, Donovan and Purschke approved Horowitz for a flat .70 basis points on loan production.

71.     On or about December 18, 2007, Plaintiff filed *another* complaint with Human Resources, referencing Purschke's inequitable application of compensation practices and lack of management support. Human Resources later closed Plaintiff's complaint with a determination that it was an unsubstantiated case leaving Plaintiff to feel dejected, humiliated and helpless.

72.     On or about May 8, 2008, Plaintiff called Horowitz several times regarding a critical loan development.  After he found Horowitz in the parking lot, he (Horowitz) responded in an outrageous and malicious manner by screaming in close proximity to Plaintiff, "That's bullsh_t!" loudly several successive times with threatening and menacing facial expressions, then

he rolled up his car window and careened away.  Plaintiff complained to Purschke regarding this incident. Not surprisingly, Purschke and Donovan ignored Plaintiff's report of hostile harassment by Horowitz and, upon information and belief, Horowitz suffered no discipline for his outrageous and threatening conduct towards Plaintiff.

73.    From May 8, 2008 forward, Horowitz refused and/or failed to assist Plaintiff with any customer loan processing problems including the continuing pattern of extremely slow turnarounds and, as a result, the dollar amount of Plaintiff's expected May funding *substantially declined.* Without support of the senior branch management, Plaintiff was unable to rectify the delays and obstacles to his extreme detriment.  The deliberate, retaliatory lack of any assistance or intervention on Plaintiff's behalf by Defendant Horowitz as the Branch Manager created impossibility of production performance for Plaintiff.

74.    On or about May 13, 2008, Plaintiff received a call from Purschke asking to meet with Plaintiff to "catch up" since Purschke had not visited Plaintiff's Massapequa branch in several weeks.

75.    On or about May 15, 2008, without any prior verbal warning to or internal dialogue with Plaintiff, Purschke presented James with a retaliatory formal Written Counseling, dated May 7, 2008.  This Counseling warned of Plaintiff's potential termination. Plaintiff's immediate supervisor, Defendant Horowitz, did not attend the Counseling although he was present in the branch that day.  Plaintiff learned subsequently that Defendant Horowitz was the instigator behind the underlying complaint that was based on false and unsubstantiated allegations in an effort to threaten and dissuade Plaintiff from making complaints about Horowitz to the company. This Counseling followed after Plaintiff's internal company complaint to address concerns that evolved from unsolicited allegations of a branch customer (who was an

22